# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMY BATTLE TAYLOR, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )       10-cv-844 (RCL) |
| | ) |
| ISLAMIC REPUBLIC OF IRAN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

## I.   INTRODUCTION

This case arises out of the horrific bombing of the United States Marine Corp barracks in Beirut, Lebanon in 1983. The attack destroyed the facility, killing 241 servicemen and leaving scores wounded. Plaintiffs are family members of eight servicemen killed in the explosion, and they bring this action under the "state-sponsored terrorism" exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq*., which was enAacted as part of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"). Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008). This provision, codified at 28 U.S.C. § 1605A, creates a "federal right of action against foreign states." *Simon v. Republic of Iran*, 529 F.3d 1187, 1190 (D.C. Cir. 2008). Plaintiffs' suit alleges that defendant Islamic Republic of Iran ("Iran") created and supported the terrorist organization Hezbollah, and subsequently directed that organization to take "spectacular action" against the U.S. Marines stationed in Lebanon. According to plaintiffs, Iran may be held liable under § 1605A for the infliction of severe mental anguish and emotional devastation that resulted from the death of plaintiffs' family members in Beirut. For

the reasons set forth below, the Court finds that plaintiffs have provided sufficient evidence to establish a cause of action against Iran under the FSIA's state-sponsored terrorism exception.

## II.    PROCEDURAL HISTORY

### A.    Prior Beirut Bombing Litigation

There is a lengthy history of litigation before this Court concerning the 1983 bombing of the U.S. Marine barracks in Beirut.  In the seminal case, *Peterson v. Islamic Republic of Iran*, dozens of family members of the 241 deceased servicemen, as well as several injured survivors of the attack, sued both Iran and the Iranian Ministry of Information and Security ("MOIS"), seeking to hold them liable for the attack under the former state-sponsored terrorism exception, which at that time was codified at 28 U.S.C. § 1605(a)(7).  264 F. Supp. 2d 46, 48 (D.D.C. 2003).  Over two days in March of 2003, the Court conducted a bench trial at which it heard testimony from lay and expert witnesses and received documentary evidence concerning the bombing, the catastrophic results, the involvement of Iran and MOIS, and their support for international terrorism in general.  *See generally id*. at 48–59 (discussing evidence and findings of fact).  Based on that evidence, the Court found "that it is beyond question that Hezbollah and its agents received massive material and technical support from the Iranian government. . . . [and] that it is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran."  *Id*. at 58.  The Court then determined, as a legal matter, that "MOIS actively participated in the attack" and was "acting as an agent of . . . Iran" when doing so, and thus Iran and MOIS were "jointly and severally liable to the plaintiffs" for damages.  *Id*. at 61.

Several new suits against Iran and MOIS were filed following the finding of liability in *Peterson*.  Of greatest importance for these purposes are the cases consolidated in *Valore v.*

*Islamic Republic of Iran*, which involved the servicemen at the center of this case, among others. 700 F. Supp. 2d 52, 61 n.1 (D.D.C. 2010).[1]  In addition, various family members of these three servicemen "brought claims for intentional infliction of emotional distress, seeking solatium." *Id*. at 60 & 61 n.4.  The Court, relying extensively on the evidence presented in *Peterson*, determined that "defendants are liable for extrajudicial killing and the provision of material support and resources for such killing, which was committed by officials, employees, and agents of defendants; which caused injury under several theories of liability; and for which the Court has jurisdiction for money damages." *Id*. at 80–81.  The Court then awarded compensatory and punitive damages, totaling $290,291,092 and $1,000,000,000, respectively.  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 82 (D.D.C. 2010) (summarizing awards in *Valore*). Subsequent to the opinion in *Valore*, several other cases related to the 1983 attack, including this one, were filed.

### B.     This Action

Plaintiffs's suit was filed in the Spring of 2010.  Complaint, May 20, 2010 [3].  In their complaint, plaintiffs declare that they "consist entirely of U.S. nationals who are immediate family members or the estates of such family members of deceased members of the United States Marine Corps, United States Navy, or United States Army, who died as a result of injuries inflicted in the terrorist attack upon the United Staets Marine Corps . . . in Beirut, Lebanon, on October 23, 1983.  *Id*. at ¶ 3.  They allege that Hezbollah, a "Lebanese terrorist organization," was "given extensive support by the Defendant, which permitted it to carry out a wide ranging program of terrorist against the United States and the State of Israel."  *Id*. at ¶¶ 5–6.  Plaintiffs further allege that, "at the time of the acts which give rise to this action, Hezbollah was under the

---

[1] The *Valore* opinion involved four consolidated matters.  Of importance here, seven of the eight servicemen involved in this suit were also involved in *Valore*, No. 03 Civ. 1959, and one was involved in *Arnold v. Islamic Republic of Iran*,

complete operational control of the Defendant" and that the "provision of extensive economic support by the Defendant to Hezbollah, was necessary for that organization to carry out a terrorist attack of the scope and technological sophistication of the attack of October 23, 1983." *Id*. at ¶ 6. Based on these allegations, plaintiffs allege that defendant intentionally inflicted emotional distress upon them by causing Hezbollah to decimate the Marine barracks in Beirut and murder their family members. *Id*. at ¶¶ 13, 15, 17, 19, 21, 23, 25 & 27. Plaintiffs seek solatium damages for pain and suffering, *see generally id*. at Counts I–VIII, as well as punitive damages on the ground that defendant acted in an "intentional and malicious" manner that was "in willful, wanton and reckless disregard of the rights and physical well-being of each of the Plaintiffs." *Id*. at ¶ 29.

Plaintiffs served Iran by mail as permitted by the FSIA, 28 U.S.C. § 1608(a)(3), and defendant accepted service in late December. Return of Service/Affidavit, Feb. 23, 2011 [9]. This acceptance of service obligated Iran to respond in some manner to the Complaint by February 23rd of this year. 28 U.S.C. § 1608(d). Several months later, after no response was received from defendant, plaintiffs obtained entry of default, Clerk's Entry of Default, May 11, 2011 [14], and subsequently moved for default judgment. Motion for Entry of Default, May 10, 2011 [12]. Based on this motion, as well as the facts in the record or available for judicial notice, the Court renders the following findings of fact and conclusions of law.

## III. FINDINGS OF FACT

Under the FSIA, a court cannot simply enter default judgment, but must, out of respect for the principle of sovereign immunity, ensure that plaintiffs "establish [their] claim or right to relief by evidence that is satisfactory to the court." 28 U.S.C. 1608(e). This requirement "imposes a duty on FSIA courts to not simply accept a complaint's unsupported allegations as

true, and obligates courts to inquire further before entering judgment against parties in default.

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal quotations omitted) ("*Rimkus II*").  To satisfy this burden, plaintiffs presented evidence concerning their backgrounds and injuries suffered, and also that the Court take judicial notice of prior findings of fact and evidence related to the Beirut bombing and defendant's involvement in the attack. Earlier judicial findings of fact "represent merely a court's probabilistic determination as to what happened," and thus constitute hearsay and are inadmissible.  *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010).  At the same time, this Court has previously observed that "the statutory obligation found in § 1608(e) was not designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack." *Rimkus II*, 750 F. Supp. 2d at 172 (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).  Thus, the FSIA "permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced."  *Id.* (citing *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 55 (D.D.C. 2010)).  Bearing these parameters of judicial notice in mind, and armed with the special master's summary of the evidence,[2] the Court renders the following findings of fact:

*David L. Battle*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that David L. Battle was born on July 13, 1944 in the United States, and did at all times in his life remain a citizen of the United States.  Report of Special Master (Battle) 1, May 12, 2009, *Valore*, No. 03 Civ. 1959 [29].  Records indicate that Serviceman Battle was stationed in Beirut on October 23, 1983, and died as a result of the attack.  *Id.* at 2.

---

[2] Because the servicemen killed in the bombing have been involved in prior FSIA suits, special master reports have been previously entered on their behalf.

*Matilde Hernandez, Jr.*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that Matilde Hernandez, Jr. was born on February 1, 1946 in the United States, and did at all times in his life remain a citizen of the United States. Report of Special Master (Hernandez) 1, May 12, 2009 [30]. Records indicate that Serviceman Hernandez was stationed in Beirut on October 23, 1983, and died as a result of the attack. *Id*. at 2.

*John Frederick Muffler*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that John Frederick Muffler was born on December 13, 1963 in the United States, and did at all times in his life remain a citizen of the United States. Report of Special Master (Muffler) 3, Oct. 13, 2009, *Valore*, No. 03 Civ. 1959 [39]. Records indicate that Serviceman Muffler was stationed in Beirut on October 23, 1983, and died as a result of the attack. *Id*. at 3–4.

*John J. Tishmack*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that John Jay Tishmack was born on March 14, 1964 in the United States, and did at all times in his life remain a citizen of the United States. Report of Special Master (Tishmack) 3, Oct. 13, 2009, *Valore*, No. 03 Civ. 1959 [40]. Records indicate that Serviceman Tishmack was stationed in Beirut on October 23, 1983, and died as a result of the attack. *Id*. at 3–4.

*Leonard W. Walker*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that Leonard Warren Walker was born on September 20, 1961 in the United States, and did at all times in his life remain a citizen of the United States. Report of Special Master (Walker) 1, May

12, 2009, *Valore*, No. 03 Civ. 1959 [34]. Records indicate that Serviceman Walker was stationed in Beirut on October 23, 1983, and died as a result of the attack. *Id.* at 2.

*Walter E. Wint, Jr.*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that Walter Emerson Wint, Jr. was born on September 16, 1955 in the United States, and did at all times in his life remain a citizen of the United States. Report of Special Master (Wint) 1, May 12, 2009, *Valore*, No. 03 Civ. 1959 [35]. Records indicate that Serviceman Wint was stationed in Beirut on October 23, 1983, and died as a result of the attack. *Id.* at 2.

*James Yarber*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that James Glenn Yarber was born on November 24, 1945 in the United States, and did at all times in his life remain a citizen of the United States. Report of Special Master (Yarber) 3, Dec. 2, 2009, *Valore*, No. 03 Civ. 1959 [29]. Records indicate that Serviceman Yarber was stationed in Beirut on October 23, 1983, and died as a result of the attack. *Id.* at 3–4.

*Moses Arnold, Jr.*

Documentary evidence presented to the assigned special master in *Valore* demonstrates that Mosed Arnold, Jr. was born on July 21, 1963 in the United States, and did at all times in his life remain a citizen of the United States. Report of Special Master (Arnold) 1, Mar. 12, 2010, *Arnold*, No. Civ. 516 [28]. Records indicate that Serviceman Battle was stationed in Beirut on October 23, 1983, and died as a result of the attack. *Id.* at 2.

*Defendant*

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j),

continuously since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47. The Court has repeatedly found it subject to jurisdiction under the FSIA. *See, e.g.*, *Rimkus II*, 750 F. Supp. 2d 163.

*The Attack on the Marine Barracks*

Documentary evidence presented to this Court in *Peterson* establishes that in late 1982, the 24th Marine Amphibious Unit of the U.S. Marines—which included 1st Battalion, 8th Marines—was dispatched as part of an international peacekeeping coalition to the Lebanese capital of Beirut. *Peterson*, 264 F. Supp. 2d at 49. The rules of engagement issued to the servicemen in this unit stated that they "possessed neither combatant nor police powers." *Id.* Indeed, numerous witnesses at the *Peterson* trial testified that these servicemen "were more restricted in their use of force than an ordinary U.S. citizen walking down a street in Washington, D.C." *Id.* at 50. As Colonel Timothy Geraghty, the commander of the U.S. deployment testified: "The rules – these were geared primarily again with the peacekeeping mission in mind and the sensitivities of killing or maiming someone accidentally." *Id.* Given the nature of this deployment, the Court finds that the servicemen were non-combatants operating under peacetime rules of engagement.

During the *Peterson* trial, the Court heard the videotaped deposition of a Hezbollah member known by the pseudonym "Mahmoud." 264 F. Supp. 2d at 54. Mahmoud is a Lebanese Shi'ite Muslim, and was part of the group that carried out the attack on the Marine barracks in 1983. He provided the following information concerning the bombing:

In 1983, high-ranking members of Hezbollah and a member of the Iranian Revolutionary Guard Corps, acting at the direction of the Iranian Ambassador to Syria, met in Baalbek, Lebanon. *Id.* at 55. At this meeting, the individuals "formed a plan to carry out simultaneous attacks against the American and French barracks in Lebanon." *Id.* Subsequent to these

discussions, members of Hezbollah disguised a 19-ton truck to resemble a water delivery truck that regularly traveled to the Beirut International Airport, near the U.S. Marine barracks, and rigged the truck so that it could carry an explosive device. *Id.* at 56. On the morning of October 23, 1983, a group of Hezbollah operatives ambushed the real water delivery truck, and the fake truck was sent to the barracks, driven by an Iranian member of Hezbollah. Upon reaching the barracks, the fake truck increased its speed and broke through the wire and sandbag barriers surrounding the facility. Once the truck reached the center of the barracks, the bomb it carried was detonated. *Id.*

The *Peterson* Court also received substantial testimony concerning the explosion and its aftermath. Danny A. Defenbaugh, the on-scene FBI forensic explosive investigation, testified as an expert before the Court and explained that the explosion was, at the time, "the largest non-nuclear explosion that had ever been detonated on the face of the Earth," with a force that "was equal to between 15,000 to 21,000 pounds of TNT." *Id.* Steve Russell, the sergeant of the guard at the time of the attack, stated that the bomb left many victims mangled and in severe pain. *Id.* at 58. As a result of the explosion, 241 servicemen were killed, including the eight at the center of this suit. *Supra.*

*Iranian Involvement in the Marine Barracks Bombing*

The testimony of Mahmoud establishes that the barracks bombing was undertaken by members of Hezbollah.[3] In *Peterson*, this Court found that the group Hezbollah "was formed under the auspices of the government of Iran." 264 F. Supp. 2d at 51. This determination was based on the testimony of several expert witnesses in the *Peterson* trial. First, Dr. Patrick Clawson, a "widely-renowned expert on Iranian affairs," testified that Hezbollah was a creature

---

[3] Hezbollah is synonymous with "Hizbollah," which is merely a "variant transliteration[] of the same name." *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 273 n.3 (D.D.C. 2007) *rev'd on other grounds*, 573 F.3d 835 (D.C. Cir. 2009).

of the Iranian government: "Hezbollah is largely under Iranian orders. It's almost entirely acting at the – under the order of the Iranians." *Id*. at 51. Second, Dr. Reuven Paz, "who has researched Islamist terrorist groups over the last 25 years," stated that "at that time – even today, but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest." *Id*. at 52. Finally, Robert Baer, "a case officer in the Directorate of Operations of the CIA," explained that, at the time of the 1983 bombing, Hezbollah was constituted by "a bunch of agents of Iran." *Id*. at 52–53 n.10. In short, the Iranian government was directly tied to the actions undertaken by the members of Hezbollah—including the attack on the U.S. Marine barracks in Beirut.

In addition to evidence concerning Iran's role in creating and supporting Hezbollah, plaintiffs in *Peterson* also presented testimony concerning an intercepted message from MOIS to an Iranian official orderings attacks against U.S. Marines. Admiral James A. Lyons—who at the time was the Deputy Chief of Naval Operations for Plans, Policy and Operation—"routinely received intelligence information about American military forces" during the period leading up to the 1983 bombing. *Id*. at 54. Admiral Lyons testified about a message from MOIS to the Iranian ambassador to Syria that directed the Ambassador to contact a terrorist leader and "instruct him to have his group instigate attacks against the multinational coalition in Lebanon, and 'to take a spectacular action against the United States Marines.'" *Id*. Additional evidence showed that, following these instructions, this Ambassador to Syria then instructed an Iranian Revolutionary Guard Corp officer to attend a meeting with Hezbollah operatives, and that the attack on the Marine barracks was planned at that meeting. *Id*. at 54–55. Based on this evidence, the Court finds that Iran played a crucial and necessary role in planning and ordering the 1983 Beirut bombing.

Finally, testimony from explosives experts at the *Peterson* trial also points to Iranian involvement in the attack. At trial, experts from both the FBI and AFT "concluded that the explosive material" in the bomb "was 'bulk form' pentaerythritol tetranitrate, or PETN." *Id*. at 56. Mr. Defenbaugh, the FBI investigator, then explained that the 'bulk form' of PETN, rather than the manufactured form, "is not generally sold commercially," and that—at the time of the attack—bulk form PETN "was manufactured within the borders of Iran." *Id*. at 57. And Warren Parker, a forty-year veteran explosives expert for the Army and ATF, testified that "[t]hese are not things that you just go down to the drugstore and buy a pound of . . . . it is a state- or military-run factory that produces this type of material." *Id*. at 57–58. Based on this testimony, the Court concurs and adopts its finding in *Peterson* that "Hezbollah and its agents received massive material and technical support from the Iranian government. . . . [I]t is highly unlikely that this attack could have resulted in such loss of life without the assistance of regular military forces, such as those of Iran." *Id*. at 58.

*Iranian Support for Terrorism Generally*

In addition to the direct support of Hezbollah, the evidence presented at the *Peterson* trial demonstrates that Iran has also played a critical role in support for terrorism more generally. At the *Peterson* trial, Dr. Clawson estimated that between 1983 and 1988, the Iranian government annually spent approximately $ 50 to $150 million financing terrorist organizations in the Near East. *Id*. at 51. In funding such operations, Iran uses MOIS to exercise operational control over groups such as Hezbollah. *Id*. at 53. And these activities have only intensified and worsened: In an affidavit filed with this Court in *Valore*, Dr. Clawson estimates that today the "financial material support provided by Iran in support of terrorism is in the range of $ 300 million to $ 500 million a year." 700 F. Supp. 2d at 88.

## IV.     CONCLUSIONS OF LAW

Based on the above findings of fact, the Court reaches the following conclusions of law:

### A.     Jurisdiction

Under the FSIA, "foreign states generally enjoy immunity from suit in U.S. courts." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003). This broad protection is provided both by withdrawing original jurisdiction over suits against foreign states from all state and federal courts, and by limiting the circumstances in which a court may hear a claim against a foreign state. 28 U.S.C. §§ 1604 & 1605A(2). These general immunities, however, are not unlimited, but subject to certain enumerated exceptions—including the state-sponsored terrorism exception. Specifically, § 1605A provides that a court may exercise original jurisdiction and hear a claim against a foreign state only under limited circumstances. The evidence establishes that these necessary circumstances are present in this case.

### 1.     Original Jurisdiction

Under the FSIA's state-sponsored terrorism exception, U.S. courts have jurisdiction over suits brought against foreign states only where (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." 28 U.S.C. § 1605A(a)(1).

Here, each of these prerequisites is met. First, plaintiffs seek only monetary remedies, Complaint at 15, rendering this a suit involving only "money damages." Second, defendant Iran is plainly a foreign state. Third, the testimony presented to the special masters in *Valore* and *Arnold* establishes that each of the servicemen at the center of this action perished as a result of the attack. *Supra.* Fourth, the evidence establishes that defendant Iran founded Hezbollah for

the purpose of undertaking attacks such as the 1983 bombing and funneled money to the terrorist organization through MOIS, and also demonstrates that defendant played planning, logistical and support roles leading up the horrific attack. *See id*. This is more than sufficient to satisfy the FSIA's requirement that there be "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Valore*, 700 F. Supp. 2d at 66 (internal quotations omitted). Finally, the 1983 bombing constitutes an extrajudicial killing that occurred as a direct and proximate result of defendant's conduct in providing financial and military assistance to the attackers. On the basis of these findings, the Court has jurisdiction over plaintiffs' claims.

### 2. Sovereign Immunity

Though the Court may exercise jurisdiction over this suit, it may not hear the claim against defendant unless they have been found to have waived sovereign immunity. The FSIA provides that such immunity may be waived by operation of statute. This occurs where (1) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . or was so designated as a result of such act, and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claims is filed under this section," (2) the claimant or the victim was, at the time of the act . . . a national of the United States [or] a member of the armed forces [or] otherwise an employee of the Government of the United States . . . acting within the scope of the employee's employment," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(i)–(iii).

Here, the established facts warrant waiver of defendant's sovereign immunity as provided by the FSIA. First, Iran was designated by the U.S. Secretary of State as a sponsor of terrorism, partially in response to the Beirut bombing. U.S. Dep't of State, *Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984 (designating Iran upon concluding that "Iran is a country which has repeatedly provided support for acts of international terrorism"). Second, all eight victims of the attack were U.S. citizens, and each plaintiff is as well. *Supra*. Finally, because the bombing occurred at the Marine barracks in Lebanon—and not Iran—the FSIA's requirement that foreign defendants be given an opportunity to arbitrate this claim is inapplicable. For these reasons, defendant's immunity is waived and it may be held liable for the attack which left 241 U.S. servicemen dead, and numerous others severely injured.[4]

## B. Application of § 1605A to This Case

The NDAA provides that § 1605A may be applied retroactively under particular circumstances. Specifically, "a plaintiff in a case pending under former § 1605(a)(7) may move the Court to have that case treated as if brought under § 1605A, or a plaintiff may bring a separate action under § 1605A within a specified range following final judgment in the earlier related proceeding." *Rimkus*, 750 F. Supp. 2d at 181. Under the latter approach, a FSIA plaintiff must file a related action "not later than the latter of 60 days after (A) the date of entry of judgment in the original action; or (B) the date of the enactment of this Act." NDAA § 1083(c)(3). Judgment was issued in the related *Valore* case on March 31, 2010.[5] 700 F. Supp.

---

[4] Plaintiff served the Complaint on defendant Iran by mail on December 25, 2010, as authorized under the FSIA. 28 U.S.C. § 1608(a)(4). Return of Service/Affidavit, Feb. 23, 2011 [9]. The Court thus has personal jurisdiction over defendant. *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under §1608).

[5] Another requirement of § 1083(c)(3)'s retroactive procedures is that the original action to which the action before the Court is related must have been "timely commenced under section 1605(a)(7)." NDAA § 1083(c)(3). *Valore* was originally brought under § 1605(a)(7), and thus fits this criteria. 700 F. Supp. 2d at 57.

2d at 90. This action was filed that may—before 60 days after entry of judgment in *Valore*. The Court shall therefore apply § 1605A retroactively to Plaintiffs' claims for relief.

### C.    Estate Plaintiff Standing

Four of the plaintiffs in this action are either estates, representatives of decedents, or direct heirs bringing a right of action on behalf of decedents. These plaintiffs do not bring actions related to the decedent's own deaths, but instead seek recovery for emotional and mental anguish that the decedents suffered while still alive. Such recovery for pain and suffering, however, is not universally available to estate-plaintiffs. *See, e.g.*, Cal. Code Civ. P. § 377.34 ("In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable . . . do not include damages for pain, suffering, or disfigurement"). Thus, before determining whether plaintiffs have stated a valid cause of action under § 1605A, the Court must first determine whether these estate-plaintiffs have standing to pursue such claims in this case.

As the D.C. Circuit Court of Appeals has previously explained, because an action brought under the state-sponsored terrorism exception is based on a federal statute, the "extent and nature" of the claims is a federal question. *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). However, an estate's standing to maintain a cause of action seeking damages for injuries suffered during the decedent's lifetime is not an issue touching on the "extent and nature" of the estate's underlying claim, but rather is a threshold question concerning the power of the estate to bring and maintain legal claims. Such questions are governed by the law of the state which also governs the creation of the estate. This is plainly supported by Congress' purpose in creating a federal cause of action under § 1605A, which is to ensure that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like

circumstances." 28 U.S.C. § 1606. If an estate-plaintiff would not be permitted to bring suit against a private individual due to the operation of the state law governing the estate—which is unrelated to the "extent and nature" of the specific cause of action—nothing in the FSIA indicates that the same estate-plaintiff should otherwise be permitted to bring an identical claim against a foreign state. Bearing these principles in mind, the Court shall examine the state law applicable to each of the estate-plaintiffs in this action.

### Estate of Corinne Collins

The estate of Serviceman Battle's sister is governed by North Carolina law. Declaration of Joseph Peter Drennan ¶ 3, July 19, 2011 [16] ("Drennan Decl."). North Carolina law provides that "[u]pon the death of any person, all demands whatsoever, and rights to prosecute or defend any action . . . existing in favor of or against such person . . . shall survive to and against the personal representative . . . of his estate." N.C. Gen. Stat. § 28A-18-1 (2011). And as the North Carolina courts have explained, this provision ensures that "a civil action based upon personal injury survives the death of the plaintiff." *McGowen v. Rental Tool Co.*, 428 S.E.2d 275, 276 (N.C. Ct. App. 1993); *see also Schronce v. Coniglio*, 476 S.E.2d 366, 367 (N.C. Ct. App. 1996) (reversing dismissal of claim brought by estate's representative in lower court in reliance on § 28A-18-1). Accordingly, the estate of Ms. Collins may proceed with its claims.

### Estate of Leonardo Hernandez

The estate of Serviceman Hernandez's brother is governed by Texas law. Drennan Decl. ¶ 4. Under the State's Civil Practice and Remedies Code, "[a] cause of action for personal injury . . . does not abate because of the death of the injured person." Tex. Civ. Prac. & Rem. § 71.021(a). "A decedent's personal injury action [therefore] survives death and may be

prosecuted on her behalf." *Elliot v. Hollingshead*, 327 S.W.3d 824, 833 (Tex. App. 2010).

Thus, the estate of Mr. Hernandez has standing to pursue its claims under Texas law.

    *Estate of Teresa Tishmack*

    The estate of Serviceman Tishmack's mother is governed by Minnesota law. Drennan

Decl. ¶ 5. The relevant provision of that state's law provides: "A cause of action arising out of

an injury to the person dies with the person of the party in whose favor it exists . . . . All other

causes of action by one against another, whether arising on contract or not, survive to the

personal representatives of the former." Minn. Stat. § 573.01 (2010). In construing this

provision, the Minnesota Supreme Court has acknowledged that "the modern trend is that tort

causes of action and liabilities are as fairly a part of the estate . . . as contract debts." *Johnson v.

Consolidated Freightways, Inc.*, 420 N.W.2d 608, 612 (Minn. 1988). Accordingly, Ms.

Tischmack's cause of action under § 1605A survives to her estate.

    *Estate of Walter Emerson Wint, Sr.*

    The estate of Serviceman Wint's father is governed by Pennsylvania law. Drennan Decl.

¶ 6. The provisions of Pennsylvania's code concerning estates provides that "[a]ll causes of

action or proceedings shall survive as provided in [§ 8302]," 20 Pa. Cons. Stat. § 3371, and that

separate provision specifies that "[a]ll causes of action or proceedings, real or personal, shall

survive the death of the plaintiff or of the defendant." 42 Pa. Cons. Stat. § 8302. As the

Supreme Court of Pennsylvania has explained, these statutes "do not create a new cause of action

[but] simply permit a personal representative to enforce a cause of action which had already

accrued to the deceased before his death." *Anthony v. Koppers Co.*, 436 A.2d 181, 185 (Pa.

1981). Under these provisions, the estate of Walter Wint, Sr. has standing to proceed with his

claims for intentional infliction of emotional distress.

**D.      Liability**

Section 1605A of the FSIA creates a federal statutory cause of action for acts of terrorism.  Under the state-sponsored terrorism exception, a plaintiff can seek to hold a foreign state liable for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state" if the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. §§ 1605A(a)(1) & (c).  As the Court has recently discussed at length, the third and fourth elements—causation and injury—"require plaintiffs to prove a theory of liability" in which plaintiffs articulate a justification for the recovery the damages which they seek, generally expressed "through the lens of civil tort liability."  *Rimkus*, 750 F. Supp. 2d at 175–76.  The Court will examine each of these elements in turn.

**1.      Act**

On the basis of the evidence presented in *Peterson*, plaintiffs here have sufficiently established that Iran was responsible for the horrific attack on the U.S. Marine barracks in Beirut in 1983, which killed 241 U.S. servicemen and left hundreds of others severely wounded.  The evidence concerning the actions of Iran demonstrates that it is culpable both for the extrajudicial killing of U.S. citizens and for the provision of material support to the members of Hezbollah participating in the bombing, in satisfaction of the first element of liability under the federal cause of action.

The FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim Protection Act of 1991.  28 U.S.C. § 1605A(h)(7).  That Act defines an extrajudicial killing as

> [(1)] a deliberated killing [(2)] not authorized by a previous judgment pronounced by a regularly constituted court [(3)] affording all judicial guarantees which are recognized as indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note. The evidence presented in *Peterson* establishes that, prior to the attack on the U.S. Marine barracks, orders were issued by Iran, through MOIS and to the Iranian Ambassador to Syria, instructing him to direct members of terrorist organizations—such as those that perpetrated the attack in Beirut—to take action against U.S. peacekeeping forces stationed in Lebanon. *Supra*. There is no evidence that this order was sanctioned by any judicial body, and the order to use force against members of an international peacekeeping force was in direct contravention of civil guarantees recognized as indispensable to all free and civilized peoples. Based on these findings, the barracks bombing constitute an extrajudicial killing, undertaken by members of Hezbollah acting as agents for Iran.

The FSIA declares that the concept of "material support or resources" is defined by reference to the U.S. criminal code. 28 U.S.C. § 1605A(h)(3). That definition states that support

> means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). The evidence presented at the *Peterson* trial demonstrates that during the period leading up to the bombing, Iran founded and supported Hezbollah for the purpose of advancing its own agenda. *Supra*. Testimony of multiple expert witnesses establishes that Hezbollah was essentially composed of a number of Iranian agents who were supported financially and materially by Iran and MOIS. *Id*. And more specifically, the evidence shows that the explosive materials used in the attack were of a type and grade that would only have been available to the perpetrators of the attack through direct cooperation of the Iranian

government, and that these materials could only have been used as effectively as they were with military assistance and training, which was provided by MOIS. *Id.* Taken together, these acts constitute the provision of material support for FSIA purposes.

### 2. Actor

The Court has determined that defendant Iran is responsible for the provision of material support which led to the attack on the U.S. Marine barracks in Beirut. In addition, the evidence presented in *Peterson* establishes that Hezbollah acted generally as an agent of Iran during this period, and that it was a direct order emanating from Iran which prompted the barracks bombing. *Supra.* Under such circumstances, defendant may be held vicariously liable for the extrajudicial killing perpetrated by the bombers. *See Murphy*, 740 F. Supp. 2d at 72 (holding that defendant foreign state may be held liable where Hezbollah agents "acted at the behest and under the operational control of defendants").

### 3. Theory of Recovery – Causation & Injury

The elements of causation and injury in the federal cause of action created by § 1605A require FSIA plaintiffs "to prove a theory of liability" which justifies holding defendant culpable for the injuries that the plaintiffs allege to have suffered. *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, 750 F. Supp. 2d at 72 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). When determining the contours of these theories, the D.C. Circuit has cautioned that while the "extent and nature" of such claims "are federal questions," the FSIA "does not . . . authorize the federal courts to fashion a complete body of federal law." *Bettis*, 315 F.3d at 333. Based on the Circuit Court's guidance, district courts in this jurisdiction "rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those

principles that have been adopted by the majority of state jurisdictions" to outline the boundaries of these theories of recovery. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009). Here, plaintiffs articulate two bases for relief: intentional infliction of emotional distress, and exemplary damages. Complaint ¶¶ 12–29.

### a.      Intentional Infliction of Emotional Distress

Plaintiffs sets forth eight Counts of intentional infliction of emotional distress—one Count for each grouping of plaintiffs related to one of the eight servicemen at the heart of this action. Complaint Counts I–VIII. Each Count sets forth similar factual allegations—that the attack on the U.S. Marine barracks caused the plaintiffs to suffer "extraordinary grief and mental anguish through infliction of physical injury resulting in the death of [a particular servicemen and family member]." *Id*. at ¶¶ 13, 15, 17, 19, 21, 23, 25, 27. Each individual plaintiff seeks $ 20 million in compensatory damages for their injuries. *Id*.

This Court and others have frequently addressed the intentional infliction of emotional distress theory following enactment of § 1605A. Relying principally on the Restatement, courts have set for the following standard: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)). The scope of recovery under this theory is limited by two qualifications: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time." Restatement (Second) of Torts § 46(2)(a)–(b). The former qualification is of no consequence here, as plaintiffs are either parents or siblings of the injured servicemen, and thus fall within even the strictest definition of immediate family. *See Valore*, 700 F. Supp. 2d at 79

(noting that immediate family "is consistent with the traditional understanding of one's immediate family" and includes "one's spouse, parents, siblings, and children").

The issue of presence, however, warrants a bit more discussion. Plainly, none of the plaintiffs in this action were present in Beirut and witnesses to the bombing of the U.S. Marine barracks. However, this Court has previously recognized that the presence requirement is subject to a caveat—specifically, the Restatement "'expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability.'" *Heiser*, 659 F. Supp. 2d at 26–27 (quoting Restatement (Second) of Torts § 46). As the *Heiser* Court explained: "Terrorism [is] unique among the types of tortuous activities in both its extreme methods and aims . . . . 'All acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror.'" *Id*. at 27 (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Thus, the Court concluded that a plaintiff "need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family." *Id*. Following this holding, the *Valore* Court determined that the Beirut bombing qualified as an extreme and outrageous act sufficient to invoke this theory of recovery for non-present plaintiffs, 700 F. Supp. 2d at 79–80, and the Court shall do the same here. Defendant Iran is thus liable for the mental anguish and suffering that plaintiffs have endured as a result of the attack on the U.S. Marine barracks in Beirut.

### b. Punitive Damages

In addition to the three Counts of intentional infliction of emotional distress, plaintiffs set forth a final Count on behalf of all plaintiffs, titled "Punitive Damages." Complaint ¶¶ 28–29. The Count alleges that defendant's actions were "intentional and malicious and in willful,

wanton, and reckless disregard of the rights and physical well-being of each of the plaintiffs."
and seeks an award of $500 million in punitive damages.  *Id.*

It is a well-established principle that "punitive damages is not an independent cause of
action."  *Botvin v. Islamic Republic of Iran*, 604 F. Supp. 2d 22, 25 (D.D.C. 2009) (internal
quotations omitted).  The Court recently grappled with claims solely for punitive damages under
the FSIA in *Rimkus*, explaining that "a plaintiff must set forth an independent claim—generally
sounding in intentional tort or strict liability—for which punitive damages may be an appropriate
*remedy*."  750 F. Supp. 2d at 175 (emphasis own; citing Restatement (Second) of Torts § 908
cmt. c (1979)).  In *Rimkus*, the Court permitted the plaintiff's claim for punitive damages to go
forward after determining that the plaintiff had "specifically alleged" a claim under FSIA by
setting forth "each element in the federal cause of action provided by § 1605A."  *Id.*[6]

Here, plaintiffs have not attempted to set forth a complete cause of action under Count
IV, but rather rely primarily on the nature of defendant's conduct in this case to sustain their
claims for punitive damages.  Complaint ¶ 29.  This is plainly insufficient, *see Iacangelo v.
Georgetown Univ.*, 580 F. Supp. 2d 111, 114 (D.D.C. 2008) (dismissing "free-standing punitive
damages claim as improperly pled"), and Count IV should be dismissed.

This is not to say, however, that plaintiff may not recover punitive damages in this action.
As the *Rimkus* Court also made clear, where appropriate, punitive damages may be pursued as a
remedy to an intentional tort.  750 F. Supp. 2d at 176.  Here, as seen above, plaintiffs have set
forth proper causes of action for intentional infliction of emotional distress—an intentional tort.
The Court will thus treat Count IX of the Complaint as requesting the remedy of punitive
damages in relief of the claims set forth in Counts I–VIII.  *See Park v. Hyatt Corp.*, 436 F. Supp.

---

[6] Though the Court permitted the claim in *Rimkus* for punitive damages to proceed, it did emphasize that
"future plaintiffs in all § 1605A actions . . . [should] clearly articulate the theories of recovery in future actions,"
rather than submitting merely an outline of the language found in § 1605A.  750 F. Supp. 2d at 176.

2d 60, 66 (D.D.C. 2006) (noting that "punitive damages are not an independent cause of action" but treating plaintiff's claim for punitive damages "as part of an ad damnum clause").

### 4. Jurisdiction

The Court has already determined that it is proper to exercise jurisdiction over Iran in this action, and that plaintiffs are only seeking monetary compensation. *Supra*. This element is thus satisfied, and defendant may be properly held liable under the federal cause of action embodied in § 1605A for the bombing of the Marine barracks, which resulted in the deaths of servicemen Battle, Hernandez, Muffler, Tishmack, Walker, Wint, Yarber, and Arnold, and caused members of their families to suffer severe mental anguish as a result.

## V. SPECIAL MASTERS

Though the Court has determined that defendant is liable to plaintiffs under the FSIA, it also lacks evidence necessary to render an appropriate measure of damages. In determining the proper measure of damages, "[t]he courts of the United States may appoint special masters to hear damages claims brought under" the state-sponsored terrorism exception to the FSIA. 28 U.S.C. § 1605A(e)(1). Here, appointment of a special master would not impose undue expenses on any party and will not result in unreasonable delay—a prerequisite set forth in Fed. R. Civ. P. 53(a)(3). To the contrary, the use of special masters will affirmatively assist the Court in the efficient resolution of claims in this action.

Plaintiffs recently moved for the appointment of Alan L. Balaran as special master in this case. Motion for Appointment of Special Master, Aug. 22, 2011 [21]. Upon review of Mr. Balaran's curriculum vitae and sworn affidavits, *see* Declaration of Alan L. Balaran, Aug. 22, 2011 [21-1], the Court finds that Mr. Balaran is in compliance with the Plan that will govern this case. *See* Administrative Plan Governing Special Masters, Aug. 22, 2011 [21-1].

## VI.    CONCLUSION

For the reasons set forth above, the Court finds that defendant Iran is responsible for plaintiffs' injuries and thus liable under the FSIA's state-sponsored terrorism exception.  The Court will now await factual findings of the special master.

A separate Order consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on August 29, 2011.